(No. 14526.—Reversed and remanded.)

JOSEPH KING *et al.* Appellees, *vs.* WILLIAM E. HARPSTER, Appellant.

*Opinion filed December 19, 1922—Rehearing denied Feb. 7, 1923.*

1. MORTGAGES—*when trustee has no authority to accept payment on trust deed.* A trustee in a trust deed owned and possessed by a third party, who also owns and holds the note for which the trust deed is security, has no implied authority to receive payment on the note, and if such payment is made to him and he releases a portion of the property from the lien of the trust deed such action has no effect upon the right of the holder to foreclose.

2. SAME—*mortgage is not assignable as negotiable paper.* The doctrine of an innocent purchaser for value, which applies to commercial paper, has no application to a mortgage, but the assignee of a mortgage takes it subject to all equities existing in favor of the mortgagor and to which it was subject in the hands of the assignor, and it is the duty of the assignee to inquire of the mortgagor if there is any reason why it should not be paid.

3. SAME—*when a mortgage held as collateral by bank must be canceled.* A bank which takes over a mortgage or holds it as collateral has no rights superior to those of its assignor, and where the trustee in a trust deed, without authority, accepts payment of the indebtedness and has the holder of the note and trust deed deliver the papers to a bank, which agrees to accept the trustee's note for the indebtedness and to credit the account of the holder with the same, with the understanding on the part of the mortgagor that the debt is extinguished, the bank must be regarded as the equitable assignee of the trustee, and the mortgagor's equity being good against the trustee will be good against the bank, and the mortgage must be canceled.

4. SAME—*when a deed made by mortgagor should not be canceled—cross-errors.* Where, to reduce the indebtedness, the maker

of a trust deed sells a portion of the property with the understanding that the consideration, which is paid to the trustee by the purchaser, is to be applied to the debt, the deed for which the consideration is paid cannot be canceled in a suit to cancel the trust deed after the trustee has misappropriated the purchase money, and where the purchaser has appealed from a decree canceling his deed and refusing to cancel the trust deed, and has assigned errors thereon, his rights will be determined regardless of whether cross-errors were assigned by the complainant, who did not appeal, and regardless of how his rights under the decree will be affected.

APPEAL from the Circuit Court of Moultrie county; the Hon. GEORGE A. SENTEL, Judge, presiding.

McLAUGHLIN & BILLMAN, EDWARD C. CRAIG, DONALD B. CRAIG, JAMES W. CRAIG, JR., JAMES CRAIG VANMETER, and FRED H. KELLY, for appellant.

MILLER & PATTERSON, and HENLEY & DOUGLAS, for appellees Joseph King and Emma F. King.

FRED A. KINZEL, for appellee the State National Bank of Mattoon.

Per CURIAM: Joseph King and his wife filed a bill in the circuit court of Moultrie county against William E. Harpster, the State National Bank of Mattoon, Uriah T. S. Rice, and others, praying for the cancellation or release of record of a certain mortgage, and for other relief. A demurrer to the bill for multifariousness was sustained and the bill was dismissed, but this decree was reversed. (*King v. Rice,* 285 Ill. 123.) After its remandment, the filing of answers and a reference to the master, the cause was heard in the circuit court, and a decree was entered canceling a warranty deed made by King and his wife to Harpster, dated December 9, 1912, and requiring an accounting by Harpster for the use of the land from the date of the delivery of the deed until the surrendering of its possession to King,

and decreeing the mortgage for $2500 mentioned in the bill to be a valid lien on the sixty-five acres of land described in the mortgage for the amount of the $2500 note which it purported to secure, and interest. The defendant Harpster has appealed from this decree.

A statement of the facts material to the decision of the case follows: Joseph King was the owner of a farm of sixty-five acres in Moultrie county. On January 17, 1909, he and his wife having borrowed $2500 from Rice executed their note of that date for that sum, payable to their own order, with six per cent interest, payable semi-annually, and due on January 1, 1914, which they indorsed and delivered to Rice. To secure this note they also executed a trust deed to Rice as trustee. In the fall of 1912 King agreed to sell twenty-six acres of this land to Harpster for $2000, the purchase money to be applied on the trust deed. On December 9 he and his wife executed the deed in controversy to Harpster for the twenty-six acres upon an express consideration of $2000 and left it with Rice at his office in Mattoon, to be delivered to Harpster upon payment of the consideration. Rice had no interest in the $2500 note secured by the trust deed and had neither the note nor the trust deed in his possession, but they belonged to Mrs. Augusta Miller, who had possession of them. Rice had collected the semi-annual interest since the making of the note, the payments being made to him at his office by King, to whom Rice surrendered the interest coupons as they were paid. King and his wife at the time they executed the deed to Harpster executed a new trust deed to Rice as trustee on the remaining thirty-nine acres of the sixty-five-acre farm for $900, $500 of which was to apply on the $2500 trust deed and with the $2000 to be paid by Harpster was to satisfy it, and the remaining $400 was paid to King in cash or by other payments that were satisfactory to him. On December 17 Harpster went to Rice's office and paid him $2000 by means of a check payable to Rice, trustee, which

the latter deposited in the State National Bank of Mattoon, of which he was a customer. Rice executed and delivered to Harpster a release of the twenty-six acres conveyed to him from the $2500 trust deed. Mrs. Miller kept the $2500 note and trust deed in her safety deposit box at the State National Bank of Mattoon. In July, 1912, she delivered it to the bank for collection, and the bank held it for that purpose until January 13, 1913. Rice inquired of the bank if it would take the mortgage over from Mrs. Miller, but was told by the president that the bank could not do that because it was a national bank but that it could take Rice's note with the mortgage as collateral. That was done, and Rice gave to the bank his demand note of that date for $2500, with the $2500 mortgage and the $900 mortgage of the Kings as collateral security, and the bank credited Mrs. Miller with $2500.

The appellees' claim against Harpster is that he agreed to pay for the land by paying $2000 upon the $2500 which King owed, and Harpster's claim is that he was to pay for the land by paying $2000 to Rice and receiving a release of the mortgage on the twenty-six acres. King testified that he told Harpster that the latter could have the land for $2000; that it was to be paid out on a mortgage, and that the trade would have to be closed at Mattoon, where the mortgage was, at Rice's office. Harpster told him he had better go to Mattoon and have the deed written out; that Harpster wanted Joe Martin to inspect it to see if the deed and the abstract were all right; that Harpster told him to leave the deed at Rice's office. Again, King testified that Harpster asked him if he had been to Mattoon to fix things up, and when King said he had not, Harpster said he wished King would do that; that he wanted to get it off his mind. He also said that he would go there, fix the business over there and pay the $2000 on the note and mortgage and have it credited on the mortgage. King told Harpster he had to do that to have a good title to the land.

Harpster testified that in the conversation when King agreed to accept Harpster's $2000 nothing else was said; that a few days later King said he could not pay off the mortgage for $2500 which Rice held until the first of the year, and it was no use to fix up the papers until then, and Harpster said that would be satisfactory. In the conversation a few days later Harpster said he would have Joe Martin look after the matter for him, and about ten days later King said he would get Rice to look after the matter for him and would go to Mattoon to fix the papers and leave them with Rice, and for Harpster to go there and pay the money to Rice. Harpster said that King had better be present, but King said that Rice had said there was no need for him to be there. Later King told Harpster the papers were made out and fixed, and all Harpster had to do was to go to Rice, pay the money and Rice would deliver the papers. Harpster saw Martin, who was his brother-in-law and a lawyer, made arrangements to go to Mattoon, and then saw King and told him to meet Harpster and Martin in Mattoon the next day; that Martin, who lived in Sullivan, would come on the noon train and would want to get back on the next train. King said he would be there, but if he wasn't they should go ahead and fix it up, and all Harpster had to do was to pay the money and get the release; that King had got Rice to look after the matter for him. In rebuttal Harpster further testified that when he and King talked about the matter first, King told him there was a mortgage on the land and the reason he was selling the land was to pay off the mortgage, and the arrangement between them was that Harpster was to have the twenty-six acres of land for $2000 and it was to be clear of any mortgage; that King told him the mortgage was at Mattoon, at Rice's office, and he told King that he would go to Rice's office and pay the money.

Martin testified that King called at his office and told him that Harpster wanted him to look after the matter for

Harpster, and said that Rice owned the $2500 mortgage
and could release the land; that it was not necessary for
King to be present at the time of payment, and if he were
not, Rice would have full authority to close it up; that he
had all the papers, and the only thing to do was to pay the
money and get the deed and release.    Martin said to King
that Harpster would want his land clear, and asked whether
King was going to pay off the mortgage and get it released.
He answered that he was not; that they had made arrange-
ments for Rice to get the money that Harpster was to pay
for the land, and Rice would release the land that Harpster
was buying, from the mortgage.    Martin asked King who
owned the $2500 mortgage, and he said Rice told him that
he owned it, and that he could release the land Harpster
was buying and make it as good as if the whole mortgage
was released.    Before the deal was closed King again came
to Martin's office in Sullivan and said that Harpster wanted
Martin to go to Mattoon two days later.    Martin told him
that he would have to go over on the noon train and back
on the next train and would have a little over an hour be-
tween trains.    He wanted King to be there at Rice's office
so that he could close up the deal and get back on the next
train.    King said he expected to be there, but if he was not,
Rice would have full authority to close it up; that he had
all the papers, and the only thing to do was to pay the money
and get the deed and release.    Martin said, "I do not know
whether Harpster will have the money or will have a check,
but if you are not there Rice will very likely want the
check payable to him before he will deliver the release of
the land."    King said that was all right; the money was
going to him any way; make the check to him and he and
Rice would settle later.    Martin told him all right, but he
had better be there.    When he got to Mattoon, two days
later, Harpster and his wife and son met him there and
they went directly to Rice's office, but King was not there.
The $2000 was paid to Rice, he delivered the deed and

release to Harpster, and the deed was filed for record the same day.

Mrs. King testified that she with her husband came to Rice's office after dinner, and he told them that Harpster had given him a check for $2000 which he would have to go to the bank and deposit, and she saw him start to go to the bank. She knew there were some papers they ought to get, and Rice told them he could not give him the $2500 note and coupons until January 1. She didn't think much about Harpster's not getting them, but they relied on Rice's getting the note and mortgage and sending them to them after January 1. She heard Harpster say that he had no confidence in Rice and wanted the original abstract.

The payment to Rice was not a payment on the $2500 note, which belonged to Mrs. Miller, and Rice had no authority, real or apparent, for its collection. (*Stiger* v. *Bent,* 111 Ill. 328.) Her rights were not affected by such payment. She had the right to proceed to foreclose the trust deed without any reference to Rice's action, and had the bank purchased the securities from her it also could have foreclosed the trust deed. The bank, however, did not do this. It refused to purchase the note and mortgage from Mrs. Miller for the reason that being a national bank, in the judgment of the president it had no authority to make such a purchase. The president suggested to Rice, however, that the latter could make the purchase, and while the bank could not purchase the trust deed it could accept it as collateral security from him on his note and would do so. Rice assented to this proposition. Mrs. Miller was informed of and agreed to it, and on January 13, 1913, the bank accepted Rice's note for $2500, delivered the note and trust deed to him and accepted them as collateral security for the note which he had just signed and gave Mrs. Miller credit for $2500. The title by which the bank held the mortgage was therefore derived through Rice, and its rights were in equity in no respect superior to his. He

could not, as owner of the trust deed, foreclose it, because he had received the money with which to pay it, and, in equity, when he became the owner of the note he was bound to apply the money to its payment. Moreover, when the bank accepted the trust deed as collateral security for Rice's note, it took it with notice that Rice, its grantor, had released the trust deed on December 17, 1912, as to the land conveyed to Harpster, and his release had been recorded since that date. He could transfer no better title than he had. His grantee could acquire no rights which Rice, the holder of the mortgage, did not possess, not because the bank had actual notice of the transaction but because in equity it was affected with notice. Its rights were only those of its grantor. Since its grantor could not foreclose in equity the grantee had no power to do so. The doctrine of an innocent purchaser for value, which applies to commercial paper, has no application to a mortgage. The assignee of a mortgage takes it subject to the same equities it was subject to in the hands of the assignor. The assignee of a mortgage knows that it is not assignable at common law but only in equity and that he takes it subject to all equities existing in favor of the mortgagor. It is therefore the duty of the assignee to inquire of the mortgagor if there is any reason why it should not be paid. (*Olds* v. *Cummings*, 31 Ill. 188; *Silverman* v. *Bullock*, 98 id. 11; *Himrod* v. *Gilman*, 147 id. 293; *Buehler* v. *McCormick*, 169 id. 269; *Peacock* v. *Phillips*, 247 id. 467.) The right to recover on the note against its makers in a court of law is not involved in this case, which is concerned only with the lien of the trust deed on the land. The bank expressly declined to become a purchaser of the note and trust deed from Mrs. Miller but with her approval lent Rice the money with which to pay her, upon his taking the trust deed and pledging it as collateral security for his note to the bank. As between King, the mortgagor, and Rice, the debt was extinguished and could not have been enforced by Rice against

King, and the bank being only Rice's equitable assignee can not enforce it. (*Chicago Title and Trust Co.* v. *Aff*, 183 Ill. 91.) The bank's title as pledgee of Rice is subject to King's equity against him, and it was therefore error to decree the trust deed to be a lien against the premises.

It is clear that both King and Harpster expected the $2000 payment to apply on the $2500 trust deed; that the Kings, at least, had confidence in Rice and did not doubt the honesty of his conduct in the transaction or his authority in dealing with the $2500 mortgage. They had paid interest to him for several years. They had made arrangements with him for a new loan on the remaining thirty-nine acres of their farm and to take up the remainder of the $2500 note. They executed the deed and left it with him to be delivered to Harpster upon payment of the purchase money, and there is no reason to suppose that they were relying upon Harpster as to Rice's authority to receive payment of the purchase money. The preponderance of the evidence is that King said that Rice would have full authority to close up the trade; that he had all the papers, and the only thing to do was to pay the money and get the deed and release. Harpster having paid the full purchase price for the land in accordance with King's directions, and having received the deed from the depositary with whom King had left it, it was erroneous for the circuit court to decree its cancellation.

It is urged that the cancellation of the $2500 trust deed by direction of this court would be to alter the decree as to King, who assigned no cross-errors on this appeal and is bound by the decree below. Harpster, the appellant, did assign as error the decree of the court canceling his deed and confirming the $2500 trust deed as a lien, claiming he was entitled to a deed to the twenty-six acres free from any incumbrance and that the release of the $2500 mortgage is valid. The power of this court to declare the equities be-

tween the parties to this case does not depend upon whether King assignd cross-errors nor whether the holding of this court will be a benefit or a detriment to him. The question arises on the assignment of error by Harpster. We are of the opinion that his contention is right. Therefore, whether King assigned cross-errors, or how the holding of this court affects him, is of no consequence. The circuit court erred in canceling the deed to Harpster and declaring the $2500 trust deed a valid lien.

The $900 mortgage on the thirty-nine acres remaining in King was, as we have seen, for the purpose of paying the $500 remaining on the trust deed after the application thereon of Harpster's $2000, the remaining $400 thereof being paid to King in cash. King's bill of complaint does not deny the validity of the $900 mortgage, and he in his prayer for relief concerning it asks only that in case the trust deed be held a valid lien, the sum of $500 (the balance not received by him on the $900 mortgage) be applied on the $2500 trust deed and its amount be reduced to that extent. For reasons herein given the circuit court should have canceled the $2500 trust deed. This would have left standing as a valid lien against the thirty-nine acres still owned by King, the $900 mortgage.

The decree will be reversed and the cause will be remanded, with directions to the court to enter a decree canceling the $2500 trust deed, dismissing the bill as to Harpster's twenty-six acres, confirming the title thereto in him free from the lien of the $2500 trust deed, and decreeing the $900 mortgage to be a valid lien against the thirty-nine acres owned by King, costs to be decreed against the State National Bank of Mattoon.

*Reversed and remanded, with directions.*