M. F. Dunlap, Defendant in Error, v. Charles M. Peirce et al., Plaintiffs in Error.

Gen. No. 8,172.

1

**2**

Opinion filed January 25, 1928.

H. J. Thompson, George C. Weaver and Charles M. Peirce, for plaintiffs in error.

John J. Reeve and Bellatti, Samuell & Moriarity, for defendant in error.

Mr. Presiding Justice Shurtleff delivered the opinion of the court.

This suit is a proceeding by bill in equity in the circuit court of Pike county brought by M. F. Dunlap, defendant in error, to the April term, A. D. 1926, to foreclose a mortgage which was executed by plaintiffs in error, Charles M. Pierce and Ella B. Peirce, and made to Otis E. Taylor and William H. Petefish, dated December 17, 1924, given to secure notes of the same date, aggregating $90,000, payable at different times,

the last note being payable July 1, 1929, and all having coupon notes attached for all the interest due respectively on the notes. The mortgage covered 1,000 acres of land, more or less, in Pike county, Illinois.

The bill alleged that the notes and mortgage had been executed by the makers and delivered to the payees and that the mortgage had been duly recorded in Pike county, Illinois, and that the notes and mortgage had been duly assigned by the said payees to M. F. Dunlap. It was provided in each of the notes and also in the mortgage that if default was made in the payment of any interest coupon when due, then the principal notes should immediately become due and collectible. The notes were made to draw interest from January 1, 1925, which was payable annually. The bill alleged that the interest coupon notes due January 1, 1926, were not paid, and that the holder elected to declare all of the principal notes due and filed his bill to foreclose the mortgage.

It appears from the answer and cross-bill of plaintiffs in error that on December 13, 1924, Otis E. Taylor and Effie Taylor, his wife, as parties of the first part, had entered into contract in writing, under seal, with the plaintiffs in error, Charles M. Peirce and Ella B. Peirce, his wife, as parties of the second part, by the terms of which the parties of the first part were to convey to the said Charles M. Peirce 1,000 acres of land, more or less, particularly described in Atlas township, Pike county, Illinois, said lands being subject to one first mortgage for $60,000, bearing date August 12, 1924, together with the interest accruing thereon after the first day of January, 1925; and the parties of the second part covenanted to convey to the said Otis E. Taylor of Morgan county three separate tracts of land, situated in the county of Mississippi and State of Missouri, with incumbrances as follows: 125.93 acres, subject to one first vendor's lien of $9,927.40, bearing in-

terest at 6 per cent per annum; the second tract of 597 acres, subject to one first lien secured by trust deed of $53,800 to be due April 1, 1932, bearing 6 per cent interest per annum, and the third tract of 260 acres, subject to one first lien secured by trust deed of $24,000 to be due April 1, 1932, and bearing interest at the rate of 6 per cent per annum.' The contract recites: "and there being accrued interest and taxes on said premises unpaid, it is mutually agreed by and between the parties that the residue hereinabove specified that the deeds are made subject to is to be credited by party of the first part on notes maturing July 1, 1928, hereafter to be given by party of the second part." It was agreed that the interest on said indebtedness and taxes and assessments were to be figured to January 1, 1925, and in further consideration of the conveyances the second parties (plaintiffs in error) further agreed to make and assign notes to the amount of $90,000 secured by a second mortgage on the tracts of land in Pike county, Illinois, amounting to 1,000 acres, as of date January 1, 1925, said notes to be for the following amounts and to be due at the following dates: $10,000, January 1, 1927; $5,000, January 1, 1928; $5,000, January 1, 1929, and the residue to be in one note to be due July 1, 1929. All of said notes to draw interest at the rate of 6 per cent per annum and all to be secured by one second mortgage instrument covering said lands. There was a further clause as to each assigning insurance policies and it was further agreed that each of the respective parties would furnish an abstract of title, brought down to date, showing merchantable title in them as thereinbefore provided, subject to liens and incumbrances. The contract contained further clauses as follows:

"It is further mutually agreed that the lands being conveyed by first parties has had a question as to merchantable title heretofore raised and money on a former deal by party of the first part has been held to have

a bill filed in quieting title to said property. That parties of the second part shall have the option to have the title quieted or in case they deem it best to pass the errors and whatever money is paid to party of the first part for waiver of the bill to quiet title shall be divided between party of the first part and party of the second part hereto, but if party of the second part elects so to do party of the first part is to put the quiet title suit or cause the quiet title suit to be put through at his expense and without cost to party of the second part, party of the second part to consent that his name as owner may be used in the quiet title suit.

"It is further mutually agreed that this deal is to be closed at the office of C. M. Peirce in Bloomington by the delivery of deeds within five days of the date hereof and that the residue of this agreement outside of the exchange of deeds shall be closed at the office of C. M. Peirce in Bloomington, not later than the first day of January, 1925.

"It is further mutually agreed between the parties that whereas party of the first part has a $20,000 second mortgage on the above described thousand acres of land that his deed shall be subject to said additional $20,000 second mortgage and that party of the second part shall retain $70,000 in notes of the $90,000 that he is to give until the second mortgage is settled and released and the release shown upon the records."

It further appears from said answer and cross-bill that the deeds were executed and exchanged, and that plaintiffs in error executed the notes and mortgage to the amount of $90,000 in securities which were placed in the hands of plaintiff in error Charles M. Peirce, all of which was done within five days after the execution of the contract. The notes for $90,000 and the mortgage were all signed and executed by both plaintiffs in error, Charles M. Peirce and Ella B. Peirce.

It further appears that the parties of the second part elected not to take the title to the Pike county

lands in its then condition, but required a merchantable title, as shown by the abstract, and that the first parties were not able to complete "the residue of the agreement" on or before January 1, 1925, as they had covenanted to do. In the meantime, plaintiff in error had loaned to Taylor $70,000 of the notes, at Taylor's request, to take them and show, as he said, to some parties in Jacksonville, and Taylor had agreed to return the notes but did not do so. This led to what is called a "supplemental" agreement entered into between said Otis E. Taylor, William H. Petefish and Claude C. Petefish, parties of the first part, and plaintiff in error Charles M. Peirce, party of the second part, under date of January 17, 1925, reciting the former agreement and reciting that the parties of the first part "have not at this time a merchantable title for the 1000 acres of land situated in Pike County, . . . and whereas the said 1000 acres is subject to a second mortgage originally for the sum of $22,688.88, and whereas the same is unpaid and is being held by agreement between parties of the first part . . . and an agreement from the former owner of this land from whom they obtained title, Harry L. Nichols of Pike County, Illinois, and whereas said Nichols is filing a bill to quiet title to said premises," etc.

It was further recited in the supplemental agreement that: "whereas the contract of December 13, 1924, so far as deeds are concerned, has been executed and delivered and placed upon record and whereas party of the second part has executed $90,000 in notes secured by a second mortgage on said 1000 acres and in order that nobody may suffer any loss at all it is agreed supplemental to said agreement of December 13th, that said $90,000 secured by second mortgage on said 1000 acres shall be deposited in the hands of the Farrell State Bank of Jacksonville, Illinois, and by said bank held with a copy of this supplemental agreement until they are directed to release and deliver the same to parties of the first part, Otis E. Taylor, Wil-

liam H. Petefish and Claude C. Petefish, and party of
the second part agrees on his part that when the title
to the said premises is quieted and abstract furnished
showing merchantable title and time afforded him to
examine same of thirty days after abstracts are fur-
nished him and in his possession for said examination
in which time party of the second part agrees by writ-
ten order to said bank to release said notes, providing
parties of the first part have complied with their agree-
ment *in toto* of December 13, 1924."

There was a further provision in the agreement that
the lands were in the possession of three tenants and
that it required some one to collect the rents and super-
vise the management of said farms until the time that
said notes could be released, and it was therefore "mu-
tually agreed by the parties that F. J. Blackburn of
Jacksonville, Morgan County, Illinois, shall act as
agent, supervise and have power to rent, collect and
receive all rents during the period of time as per this
contract contemplated and it is agreed that such rents
as he shall receive and collect shall be first applied in
interest on first mortgage of $60,000 to the Prudential
Life Insurance Company accruing from and after the
first day of January, 1925, such taxes and special as-
sessments as become due after January 1, 1925, and
if any residue remains after paying for repairs or any
seed that he is compelled to furnish to tenants shall be
applied on interest on said $90,000 notes and held by
him until the notes are released in accordance with this
agreement."

It was further agreed by the parties that all ex-
penses of the receiver or of the bank as custodian, by
agreement, of the notes should be borne by the first
parties to the supplementary agreement. This agree-
ment was signed by the parties recited, but it is to be
noted that plaintiff in error Ella B. Peirce was not a
party to the supplementary contract and is not now
liable on said notes.

The notes, secured by mortgage, were turned over to the Farrell State Bank, which accepted the trust and receipted for the instruments in accordance with the supplemental agreement, and agreed to hold the same without expense to plaintiffs in error.

It was further set out in the answer and averred in the cross-bill that said notes by fraud had come into the possession of said complainant (defendant in error), and that the said Taylor, William H. Petefish and Claude C. Petefish had never carried out their said agreements, and that plaintiffs in error or either of them had never, in writing or in any other manner, consented to or directed the release of said notes, and that the same had never been brought about by any legal proceedings against plaintiffs in error.

It was further set out and averred that the original contract and the supplementary contract made by one of the plaintiffs in error with Taylor and with Taylor and the Petefishes were effected and induced by the fraudulent representations of said Taylor, upon which plaintiff in error Charles M. Peirce relied and had no other information. It was averred that Taylor represented to plaintiff in error that the Pike county land had a cash market value of $250 per acre and could be sold for that, and that it had changed hands recently for over $200 an acre cash; that the lands were well drained and the drainage had good outlets; that said Taylor in making said original agreement represented that he was the owner of the Pike county lands and had plenty of means at his command, and agreed to pay up at once about $24,700 in interest, taxes and assessments due on the Missouri lands owing by plaintiff in error Charles M. Peirce, and that foreclosure proceedings were about to be commenced therefor against plaintiff in error, which would greatly damage and injure his credit; that there was not 1,000 acres in the Pike county lands, but only about 945 acres; and it

was further averred that Taylor and Petefish, in carrying out said suit to quiet title, had caused a judgment to be entered against plaintiff in error for the sum of $3,000 for attorney's fees and costs to the great damage of plaintiff in error.

It was further averred that plaintiffs in error had suffered great damage between December 20, 1924, and January 17, 1925, by said Taylor and Petefish offering for sale and attempting to sell said $90,000 in notes at the various banks in Bloomington where plaintiffs in error resided and where Charles M. Peirce did business, with the result that said Peirce had various loans called and was compelled to secure others and was greatly injured in his business.

Plaintiffs in error further averred that neither defendant in error, nor Taylor, nor either of the Petefishes nor any other person has ever carried out the terms of the agreements made by them with plaintiffs in error, and that they have not at any time furnished an abstract showing merchantable title to the Pike county lands, nor have they ever put plaintiffs in error in the possession of the lands. Plaintiffs in error averred that they had fully performed each and every covenant on their part to be performed by the terms of said contracts; that they had executed said notes, which had been placed in escrow, and that said plaintiff in error Charles M. Peirce had been greatly damaged by amounts claimed and plaintiffs in error prayed by their cross-bill that the defendants Dunlap, Otis E. Taylor, William H. Petefish and Claude C. Petefish should be adjudged guilty of a fraud perpetrated against plaintiffs in error, and that their rights might be determined and their damages assessed, and that it should be adjudged that there was nothing due upon the said notes, principal or interest, and that they should be canceled; and plaintiffs in error prayed for general relief.

We have stated substantially the issues as made, some of which it will not be necessary to consider in deciding the case. We have had much difficulty in following the continuity of thought of plaintiffs in error in the statement of the case and in determining the necessary details of exhibits as presented by the abstract. Neither has afforded the proper assistance.

As to the "residue clause" in the original contract to be applied upon the $90,000 in notes, both sides on trial admitted that it means something, and plaintiffs in error contend that it included $24,700 for overdue interest and taxes upon Missouri land. It is quite ambiguous from all the testimony just what it does mean. The master apparently estimated it at a portion of those items at $12,700, which with interest added makes a total credit of $13,999.62. This, deducted from the total debt and interest upon the notes found to be $99,210 by the master, left a balance of $85,210.38, which the master recommended as an indebtedness owing upon the notes by plaintiffs in error and recommended a foreclosure of the mortgage.

Various objections were presented to each item and finding of the master's report, which were overruled, made exceptions before the chancellor and overruled, and a decree was entered finding plaintiffs in error indebted to defendant in error in the sum of $85,210.38, in addition to a solicitor's fee in the sum of $500 and costs of suit. The lands were ordered sold, subject to the first mortgage for $60,000, and the master was ordered to report any deficiency upon the same promptly. Plaintiffs in error have prosecuted this writ of error.

Various assignments of error are made. It seems to be established by the proofs in the case, without any denial, that at the time of the transaction in question neither Taylor nor William H. Petefish had any interest in the Pike county lands. Nichols, who had owned the lands for several years, received them from his

father's estate. The father owned them in 1903 or 1904. Nichols testified that he sold the lands to Taylor in August, 1924, at $80 an acre. Taylor testifies that he never purchased the lands from Nichols at all, although he contracted on December 13, 1924, to convey the same lands to plaintiff in error and the contract states Taylor is the owner of the lands. A few days later Taylor produced a deed from Charles C. Petefish to Peirce for the lands, and the record is silent as to how Petefish ever obtained title, if he ever had title. Taylor and William H. Petefish both testified that they were "somewhat" in partnership with or agents for each other in land deals, and placed titles around where they would be convenient. It is conceded that Taylor and plaintiff in error Peirce traded lands or entered into the contract in question "unsight and unseen." Neither had ever seen the land of the other. There was some testimony that Ella B. Peirce with her son went to look at the Pike county lands on December 14, 1924, but if she saw the lands there is no testimony that plaintiff in error Charles M. Peirce knew anything about it. Taylor testified that they traded lands "unsight and unseen," and that he found the lands in Missouri just as Peirce had represented them to him. At the office of plaintiff in error in Bloomington, where the contract was entered into, Henry Nierstheimer was there acting as agent for Taylor; J. F. Skaggs present and Mary Gorman, the stenographer in the office. Peirce and all except Taylor testify that he stated he would pay up at once the amount of $24,000, or something over that, on the unpaid interest, taxes and assessments against the Missouri lands; that the Pike county lands were well drained with good outlets and that the lands had recently sold for cash for $200 or better an acre. Taylor does not seriously contradict this testimony, but as to the lands having sold for $200 an acre, he states that he had reference to another

tract of 850 acres in the vicinity of the 1,000-acre tract. The proof preponderates very strongly that Taylor made the representations and that Peirce relied upon his statements. The representations were false and untrue. The drainage of the land was poor and the outlets were at times blocked up completely and were very bad. The proof is conclusive that the lands never had a value of over $80 an acre and that Taylor or the Petefishes never put a penny into the tract. The first mortgage for $60,000 and the second mortgage of Nichols for $22,688.88 covered the entire purchase price for the lands, with a liberal commission to some one added. The notes and mortgage executed by plaintiffs in error, including the coupons, were all made payable to the order of Otis E. Taylor and William H. Petefish. Immediately upon Taylor borrowing the notes to take to Jacksonville and before there was any pretense of completing the contract, Taylor indorsed his interest in each and every note and coupon, without recourse, over to William H. Petefish and the notes were at once offered for sale at a large discount at the Corn Belt and First National Banks in Bloomington. Plaintiff in error Charles M. Peirce testifies that so much disturbance was caused to his credit and injury to his business that to abate it and get possession of the notes which he had never delivered, he was compelled to enter into the supplementary contract, when in fact defendant in error or his assignors had defaulted in carrying out the original agreement. No pretense is made that at this time the contract had been completed or the notes earned or delivered; nevertheless, Petefish testifies that he did offer the notes for sale and attempted to sell them. Taylor had the Missouri land conveyed by plaintiffs in error, but testifies that he received no consideration from Petefish for his interest in the notes. It was shown that there was a written contract between Taylor and Petefish covering the transactions in question, but the master refused to

require them to bring it in or permit them to be interrogated in regard to it.

The whole matter stood in the condition as described until in the fall of 1925 when William H. Petefish found a place where he could borrow the funds to pay off the so-called second mortgage of Nichols or vendor's lien. Defendant in error advanced the funds, presumably to the amount of $22,688.88, and paid off the Nichols' debt. It is said that a decree quieting title was taken in court, but no such record is shown in this proceeding.

It is shown by a summons issued on January 2, 1925, that plaintiff in error was made a defendant in a foreclosure suit and summoned before the Pike county circuit court at the suit of Harry L. Nichols. A receiver of the lands was applied for upon a petition, wherein Nichols alleged that the lands were scant security for the Nichols debt. Defendant Dunlap advanced the funds to take up the Nichols debt. Petefish testifies that the $90,000 in notes were placed in Dunlap's hands as collateral security. Just how the notes were transferred from the depositary or escrow is not made plain. There are fragmentary statements in the briefs that defendant in error replevied the notes. No record is shown of any order of court to transfer the notes, and it is not shown that plaintiffs in error were parties to any such proceeding or ever consented to such transfer. Petefish testified while on the stand that the only interest of defendant in error in the notes was to hold them as collateral security for the payment of the Nichols debt; that he never had transferred any interest in the contracts to defendant in error and that defendant in error had no legal or equitable interest in the notes. Later he was called to the stand and testified that he did transfer his interest in the contracts to defendant in error, and that such transfer was in writing; but the master refused to require the witness to bring in the writing

or permit him to be questioned in regard thereto. From the whole record it may be said that the testimony of William H. Petefish and of Taylor is equally uncertain and undependable.

Defendant in error contends in support of the decree that he and his assignors, having completed all of the terms of the agreements and the same having been fully carried out, became entitled to the possession of the notes and could recover them in replevin without making plaintiffs in error parties to the replevin suit. The first serious question raised upon this contention is whether it is shown that defendant in error and his assignors have completed their contract. Defendant in error at the most is a mere assignee of Taylor and Petefish, and takes the notes and mortgage subject to all defenses that plaintiffs in error had against them. (*Peacock v. Phillips*, 247 Ill. 467; *King v. Harpster*, 306 Ill. 202; *Smith v. Niemann*, 216 Ill. App. 179; *Utpatel v. Chicago Title & Trust Co.*, 218 Ill. App. 75.)

Defendant in error contracted to furnish plaintiffs in error an abstract of title brought down to date, showing merchantable title to the lands. The supplementary agreement is based upon the provision that defendant in error shall have complied with the agreement of December 13, 1924, *in toto*, and provides that abstracts shall be furnished showing merchantable title and time afforded Charles M. Peirce to examine the same for 30 days after the abstracts are furnished him and in his possession for said examination, in which time said Peirce "agrees by written order to said bank to release said notes, *providing* parties of the first part have complied with their agreement *in toto* of December 13, 1924." Plaintiffs in error deny that any such abstract was sent them. Under the terms of the contract, it is a condition precedent to defendant in error's case to show that such an abstract was sent before defendant in error would even be entitled to the posses-

sion of the notes. The master has found, and the chancellor has approved the finding, that an abstract was furnished plaintiffs in error and that no objection was made within 30 days to said abstract; therefore, that part of the agreement has been complied with. We cannot agree with the master and chancellor in this conclusion. There is no testimony in the record upon which it can be based. It is true that Taylor testifies: "The abstract was furnished Peirce after the title was quieted; sent by mail to his office. Peirce claimed after the abstract had been presented to him showing everything he could kick on, before Robinson, Petefish and me, that the contract of December 13 had not been carried out. . . . I sided in with Peirce and I told him that the contract did say that we were to credit these notes with the residue, and asked him if he could tell how much the notes were to be credited with. He said he didn't have the figures."

At another time Taylor testified: "I don't know when Peirce was furnished a copy of the abstract. I don't know whether it was furnished to Peirce before the supplemental agreement or not. I think before, in January, either a few days before or a few days after. I was notified by Peirce that the abstract did not show a merchantable title. I was furnished with a copy of his opinion."

Taylor and Peirce talked again about the abstract in Grote's office. Taylor testifies that he did not state to Peirce that he had transferred all of his interest to Petefish, because it was none of Peirce's business. Petefish testified that he had never offered to settle any of the amounts growing out of the contract with Peirce and that he never would. There was correspondence between Petefish and Peirce in August, 1925, in which Peirce writes he has not had time to check up on abstract, and Petefish writes that he is ready to make credit on the notes in accordance with the con-

tract as soon as the notes were in his possession so he could and Peirce gives him a basis for computation and they could agree on an account of the credit. Afterwards, on September 1, 1925, Dunlap writes that nothing remains to be closed in Peirce's office, although the contract provided that the deal should be closed at his office in Bloomington.

There is no question but that some kind of an instrument called an ''abstract'' was furnished to plaintiff in error, but to find that it showed a merchantable title to lands is a mere conclusion. It showed, so far as this record is concerned, nothing as to the title to said lands. The further contention, that because plaintiff in error did not accept or reject the abstract within 30 days he waived the provision of the contract, is not sound when it is conceded by all parties to the contract that plaintiff in error was entitled to a settlement and credit upon the notes before they were to be delivered, and that settlement by the specific terms of the contract was to be held in Bloomington.

The lower court has held and decreed that plaintiff in error was entitled to a credit of $12,700 and interest. That credit plaintiff in error was entitled to, if at all, before the delivery of the notes.

Defendant in error misapprehends the nature and meaning of the supplementary contract. It does not provide that upon the completion of the title and the furnishing of an abstract he shall become possessed or entitled to the possession of the notes in the escrow's hands. It only provides that defendant in error shall become entitled to a written order from plaintiff in error upon the escrow to turn over the notes. Plaintiff in error is entitled to his day in court to protect his own possession, which is merely committed for him to the escrow. In this case as in *Chicago & G. W. R. Land Co. v. Peck,* 112 Ill. 408, 447: ''The depositary of an *escrow* is a special and not a general agent, and

the person dealing with him is bound to know the extent of his powers. (*Smith v. South Royalton Bank,* 32 Vt. 350.) It is the settled doctrine that the delivery of an *escrow* by the depositary to the grantee named therein, without a compliance with the conditions, is not a delivery with the assent of the grantor, and conveys no title, and that the authority of the depositary of an *escrow* is limited strictly to the conditions of the deposit, a compliance with which alone justifies the delivery.'' Neither will a recovery by replevin give force to an instrument held in escrow.

In *Jacobitz v. Thomsen,* 238 Ill. App. 37, the facts were:

''The only witnesses who testified upon behalf of the plaintiff in chief were Thullen and the cashier of the bank which held the note in escrow. Thullen testified that the note was placed in escrow to be delivered upon the completion of the buildings; that the buildings were thereafter completed; that Thomsen found fault with one of them in small matters, which the witness remedied and told Thomsen he was going to the bank to get his note, to which Thomsen did not reply, but the bank refused to deliver it, whereupon he secured possession of it in a replevin suit, which is still pending. The cashier of the bank, called by the plaintiff, testified that the note was left with the bank 'in escrow, to be delivered when the buildings were completed and accepted by the Dolton estate, on instructions from Thomsen,' and that Thomsen never directed him or the bank to turn the note over to Thullen, but that the bank delivered it to the sheriff on the replevin writ.''

The court held: ''If the escrow agreement was to the effect stated by plaintiff's own witness, the cashier of the bank, it is clear that the note was never delivered. If the escrow agreement was as stated by Thullen, still, as it appears that there was a dispute as to

whether the buildings were ever completed, there could be no delivery until the dispute was settled, in the replevin suit or elsewhere. In either case, the note never became an obligation binding, as such, upon the defendants."

From the cases cited and from *Stanley v. Valentine,* 79 Ill. 544, 547; *Fitch v. Miller,* 200 Ill. 170, 180; *Grindle v. Grindle,* 240 Ill. 143, 149; *Forcum v. Brown,* 251 Ill. 314; *Osby v. Reynolds,* 260 Ill. 576, and *Main v. Pratt,* 276 Ill. 218, 224, it is apparent that the notes in question were never delivered by plaintiffs in error and never became a binding obligation upon them. No contract arises on a note until the delivery. (8 Corpus Juris 203; *Gordon v. Adams,* 127 Ill. 223.)

The contract sought to be enforced in this case by defendant in error is tinctured with fraud and misrepresentations, and is unconscionable and extortionate. It is a general rule of equity not to exercise its extraordinary jurisdiction when it will operate inequitably or oppressively. (5 Pom. Eq. Jur., 3d Ed., sec. 500; *Aldrich v. R. J. Ederer Co.,* 220 Ill. App. 333, 339; *Fargo v. Goodspeed,* 87 Ill. 290; *American University v. Wood,* 294 Ill. 186, 195.)

It would serve no useful purpose to reverse the decree in this cause to the end that these or some other parties might again submit this cause upon the completion of the contracts to this or some other court of equity. This applies to the notes executed by plaintiffs in error and the mortgage in question securing the notes to the amount of $90,000. The uncontradicted testimony shows that defendant in error, through his assigns or through those for whom he is acting, purchased the lands for $80,000, for which, by means of the misrepresentations set out, they are seeking to mulct plaintiffs in error in the full sum of $150,000 This amount is in addition to any value of the property in Missouri conveyed by plaintiffs in error to

Taylor. Defendant in error, however, has certain equities in the lands not tinctured with fraud. Under the original contract in this cause plaintiffs in error agreed to accept the lands for the principal sum of $20,000, subject to a second mortgage. It is shown without dispute that defendant in error furnished the funds with which to pay off and satisfy this second mortgage, with the full knowledge and approbation of plaintiffs in error. Defendant in error should be subrogated to the rights of the second mortgagee, Nichols, to the amount of said sum of $20,000 as of the first day of January, 1925, with interest on said sum from said first day of January, 1925, to the payment of the same, in so far as defendant in error may hereafter desire to enforce said subrogation.

A considerable amount of testimony was offered by plaintiffs in error, tending to establish substantial damages to plaintiff in error Charles M. Peirce, by reason of the acts of the defendant in error and his assignor. We have in no manner passed upon said testimony, inasmuch as in the opinion of this court plaintiffs in error have the greater equity in the cancellation of said notes and mortgage. In all other respects the parties should be left as the court found them.

The decree of the circuit court of Pike county is reversed and the cause remanded with directions to enter a decree dismissing said original bill for want of equity, without prejudice to defendant in error to seek subrogation for the amount of moneys advanced to pay off said second mortgage to the amount of $20,000, with interest thereon from January 1, 1925.

*Reversed and remanded with directions.*